*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered: February 19, 2015          517632
_____

In the Matter of ROBERT BERGER
    et al.,
                    Petitioners,

        v                                    MEMORANDUM AND JUDGMENT

NEW YORK STATE DEPARTMENT OF
    ENVIRONMENTAL CONSERVATION
    et al.,
                    Respondents.
_____

Calendar Date:   October 17, 2014

Before:   Stein, J.P., McCarthy, Garry, Lynch and Devine, JJ.

                        _____

        Nolan & Heller, LLP, Albany (Carl G. Dworkin of counsel),
for petitioners.

        Eric T. Schneiderman, Attorney General, Albany (Allison B.
Levine of counsel), for New York State Department of
Environmental Conservation, respondent.

        Zachary W. Carter, Corporation Counsel, New York City
(Janet L. Zaleon of counsel), for City of New York, respondent.

        Jacobowitz & Gubits, LLP, Walden, for David Cook and
another, respondents.

                        _____

Lynch, J.

        Proceeding pursuant to CPLR article 78 (transferred to this
Court by order of the Supreme Court, entered in Albany County) to
review a determination of respondent Department of Environmental
Conservation which found that petitioners and respondents David

Cook and Jody Cook failed to operate and maintain a certain dam in a safe condition.

The Honk Falls Dam (hereinafter the dam), located on the Rondout Creek in the Town of Warwarsing, Ulster County, was built in 1898 to generate hydroelectic power.  In 1924, United Hudson Electric Corporation (hereinafter Central Hudson)[1] purchased a number of parcels surrounding the Rondout Creek from the original owner, including the dam and hydroelectric plant, and expanded the size of the dam.  Since then, and today, the dam rises 42 feet above and spans 294 feet across Rondout Creek.  In 1941, while Central Hudson was still operating a hydroelectric plant at the dam, respondent City of New York constructed the Merriman Dam upstream from Honk Lake and acquired through condemnation certain real estate and the right to divert the waters of Rondout Creek. When the City began diverting the waters in 1944, the dam no longer had the capacity to generate power.  The City and Central Hudson, via an indenture and agreement dated March 24, 1948 and April 21, 1948, respectively, settled Central Hudson's compensation claims arising from the condemnation proceeding.

In 1949, Central Hudson transferred its property in the vicinity of the dam to the Rondout Paper Mills, Inc. and, thereafter, the property was conveyed a number of times before Ulster County acquired part of the property in 1979 via a tax deed.  At issue herein are tax parcels 83.1-2-5 and 83.6-1-11. Respondents David Cook and Jody Cook obtained parcel 83.1-2-5 from Ulster County at a foreclosure sale in 1999 (hereinafter the Cook parcel), and petitioners purchased parcel 83.6-1-11 in 1992 by a quitclaim deed given by an estate (hereinafter the Berger parcel).  The Cook parcel abuts the west side of Rondout Creek at the dam and the Berger parcel abuts the east side of the creek at the dam.

In 1981, the United States Army Corps of Engineers issued a safety report wherein it concluded that the dam was "unsafe" and in need of certain remedial repairs and maintenance.  The record

---

[1]  In 1927, United Hudson Electric Corporation was merged into Central Hudson Gas and Electric Corporation.

indicates that, beginning in 1983, respondent Department of Environmental Conservation (hereinafter DEC) periodically inspected the dam and issued safety reports, each time concluding that the dam was a "class C hazard," meaning that its failure could "result in widespread or serious damage to home(s); damage to main highways, industrial or commercial buildings, railroads, and/or important utilities, including water supply, sewage treatment, fuel, power, cable or telephone infrastructure; or substantial environmental damage; such that the loss of human life or widespread substantial economic loss is likely" (6 NYCRR 673.5 [b] [3]).  In 2006, DEC notified petitioners and the Cooks that, as owners of the dam, they had to maintain and operate it safely and pursuant to law.  Neither petitioners nor the Cooks completed any maintenance or repairs to the dam.  By notice and complaint dated April 27, 2007, DEC commenced an enforcement proceeding against petitioners and the Cooks.  Following a hearing held over nine days, the Commissioner of Environmental Conservation adopted the findings of the Administrative Law Judge (hereinafter ALJ) and determined, as relevant here, that petitioners and the Cooks were the joint owners of the dam and, therefore, were jointly and severally liable for its maintenance. DEC directed them to retain an engineer to develop a compliance plan pursuant to the dam safety regulations (see 6 NYCRR part 673), to provide financial assurance in the amount of $500,000 and assessed a civil penalty in the amount of $116,500. Petitioners commenced this CPLR article 78 proceeding against DEC, the City and the Cooks seeking to, among other things, annul DEC's determination.  The Cooks filed cross claims against DEC also challenging its determination.  Supreme Court transferred the matter to this Court.

Under ECL 15-0507 (1), "[a]ny owner of a dam or other structure which impounds waters shall at all times operate and maintain said structure and all appurtenant structures in a safe condition."  For purposes of the enforcement statute, an "owner" is "any person or local public corporation who owns . . . or uses a dam . . . which impounds waters" (ECL 15-0507 [1]).[2]   The

_____

[2]  The DEC abandoned its claim that either petitioners or the Cooks "used" the dam for purposes of the enforcement statute.

statute, which was enacted in 1999 after certain dam failures, was intended to address "the 'life threatening' dangers created by dams and the fact that many dams had not been properly maintained" (Hosmer v Kubricky Constr. Corp., 88 AD3d 1234, 1236 [2011], lv dismissed 19 NY3d 839 [2012], quoting Senate Mem in Support, Bill Jacket, L 1999, ch 364 at 7). Accordingly, the Legislature "shift[ed] responsibility from the [DEC] to dam owners . . . to encourage proper maintenance by owners in recognition of the fact that '[they] are ultimately liable for damage caused downstream as a result of negligence'" (id., quoting Senate Mem in Support, Bill Jacket, L 1999, ch 364 at 7). In this proceeding, the primary issue presented is whether petitioners and the Cooks own the dam. After finding that each party admitted ownership of the parcels abutting the creek, that each was named as an owner of the parcels in their recorded deeds and crediting the opinion of DEC's surveyor that the boundary between the Cook parcel and the Berger parcel is the midpoint of the dam's spillway, the ALJ concluded that they owned the dam. We do not agree.

Generally, we will not disturb an administrative determination made following a hearing unless it is shown that it was not supported by substantial evidence in the record (see 300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 179 [1978]; Matter of Rauschmeier v Village of Johnson City, 91 AD3d 1080, 1081-1082 [2012], lv denied 19 NY3d 802 [2012]). In our view, the Commissioner, who adopted the findings of the ALJ, erred because his findings were made without regard to the statutory basis for the agreement and indenture by and between the City and Central Hudson, and his conclusions were based on an incomplete record with regard to the condemnation proceeding. As such, we cannot conclude that the determination was supported by substantial evidence.

Historically, the City's authority to take land for its water supply derives from the Laws of 1905 (ch 724), known as the Water Supply Act (hereinafter WSA) (see generally Matter of Van

---

It is undisputed that today, the only "use" of the dam is to impound Honk Lake.

Etten v City of New York, 226 NY 483, 492-493 [1919]).  The WSA
sets forth the procedure that allowed the City to acquire "lands
or interest" necessary "to provide for an additional supply of
pure and wholesome water" (L 1905, ch 724).  "The statute
contemplates a proceeding to condemn the fee of the real property
required by the [C]ity, and a proceeding to determine the damages
arising for a decrease in the value of an established business"
(Matter of Board of Water Supply, City of N.Y., 211 NY 174, 183
[1914] [internal citations omitted]).  As relevant here, the WSA
required the City to identify potential water sources and to
approve a "final map" depicting the proposed water sources
(L 1905, ch 724, § 3).  Following the filing of the "final map,"
additional maps were to be generated showing "the various parcels
of real estate on, over or through which [dams] are to be
constructed or maintained, or by which may be necessary for the
prosecution of the work authorized by [the WSA]" and "plainly
indicat[ing] which parcels the fee, and over or through which
parcels the rights to use and occupy the same in perpetuity, is
to be acquired" (L 1905, ch 724, § 5).  The City was then
required to file these maps (see L 1905, ch 724, § 6) and
commence a proceeding by a petition that "set[s] forth the action
theretofore taken by the [City's] board of water supply and by
the [City's] board of estimate and apportionment, and the filing
of such maps" (L 1905, ch 724, § 7).  The petition had to state
"a general description of all the real estate to, in, or over
which any title, interest, right or easement is sought to be
acquired for the . . . [C]ity . . ., each parcel being more
particularly described by a reference to the number of said
parcel as given on said maps, and the title, interest or easement
sought to be acquired to, in or over such parcel, whether a fee
or otherwise" (L 1905, ch 724, § 7 [emphasis added]).

       Once maps were created and the petition filed,
commissioners of appraisal were sworn to determine the amount to
be paid to those whose property was "taken or affected" (L 1905,
ch 724, § 9).  Upon the filing of the commissioner's oaths, the
City was "seized in fee of all those parcels of real estate which
are on the maps . . . described as parcels, of which it [had]
been determined that the fee should be acquired" (L 1905, ch 724,
§ 11; see Matter of Van Etten v City of New York, 226 NY at 490-
491).  Thereafter, the City could "immediately or at any time or

times thereafter take possession of the [real estate depicted on the maps] . . . and it [could] enter upon and use and occupy in perpetuity all the parcels of real estate described in said map for the purpose of . . . maintaining on, in, under, or over the same, the said . . . dams" (L 1905, ch 724, § 11). The "just and equitable compensation" for the property "taken or affected" could be paid pursuant to either an order by the Supreme Court in the special proceeding (L 1905, ch 724, §§ 13-16) or by agreement (L 1905, ch 724, § 24). Significantly, "[t]he term real estate as used in [the WSA] shall be construed to signify and embrace all uplands, lands under water, the waters of any lake, pond or stream, all water rights or privileges, and any and all easements and incorporated hereditaments and every estate, interest and right, legal and equitable, in land or water, . . . and liens thereon by way of judgment, mortgages or otherwise, and also all claims for damage to such real estate" (L 1905, ch 724, § 25; see Matter of Van Etten v City of New York, 226 NY at 486-487).

Consistent with the procedure set forth in the WSA, the record before the Court includes a map of real estate situated along Rondout Creek prepared by the City's Board of Water Supply. The map, delineated as the Rondout Riparian No. 2 map, identifies and numbers the separate parcels located along the creek at the northern outlet of Honk Lake, as well as the dam and section of the creek located at the southern outlet of the lake. As acknowledged by the City, the map includes a date of May 6, 1941, representing the date the oaths were filed and, thus, the date the City acquired "the various parcels of real estate" set forth on the map (L 1905, ch 724, § 5; see L 1905, ch 724, § 11). It is not disputed that Central Hudson owned the parcel numbered 33 on the map and that the dam is within parcel 33.

Also consistent with the WSA, the record includes the indenture and agreement executed by the City and Central Hudson in 1948. The indenture expressly refers to "rights and properties" acquired in the 1941 condemnation proceedings, and quitclaims certain "property" of Central Hudson to the City in accord with their agreement to settle Central Hudson's compensation claim. As relevant to this proceeding, such property included "[a]ll real estate of Central Hudson . . . — Rondout Riparian Section No. 2 . . . , more particularly

described as . . . all rights in the real estate hereinafter described to the waters of Rondout Creek and the natural flow thereof; [a]ll those certain lots, pieces or parcels of real estate . . . designated as Parcels 25 to 59, inclusive, shown upon [the Rondout Riparian Section No. 2 map]" and "the right and easement in perpetuity to divert all or any part of the waters of the Rondout Creek . . . originating above the Merriman Dam of the Rondout Reservoir . . . in and against the parcels of real estate described as [a]ll those certain lots, pieces or parcels of real estate [designated and] . . . shown upon [three different and separately described maps]."  By the agreement, authorized by the Laws of 1946 (ch 804), the parties acknowledged that the City acquired the right to divert the waters of the Rondout Creek at the Merriman Dam and that "by reason of the acquisition of the right to divert and the actual diversion by the City of the waters of Rondout Creek, Central Hudson . . . [has] been damaged substantially as a result [and has] filed [a] verified claim[ ] for damages."  In settlement of Central Hudson's damage claim, the City, among other things, agreed to construct the Neversink Aqueduct and to allow Central Hudson to connect to the aqueduct and use the water for a new hydroelectric plant.  By the agreement, Central Hudson warranted that when the oaths were filed in accordance with the WSA in 1941, it had both "title to lands designated as parcel 33" and that it had "rights, privileges and immunities consisting principally of flowage and ponding rights and rights appertaining thereto in [certain other parcels, including parcel 33]."

Upon review of the indenture and agreement, the ALJ concluded that the purpose of the documents was to "memorialize the agreement reached between Central Hudson and the City regarding compensation for Central Hudson for its right to the natural flow of Rondout Creek and its right to use the diverted waters."  Finding that neither the indenture nor the agreement expressly referenced a conveyance of the dam, the ALJ concluded that neither document transferred ownership of the dam to the City.  While we agree that the indenture and agreement memorialized the settlement and release of Central Hudson's damages claim, the ALJ failed to recognize that the property actually taken was as defined in the maps filed pursuant to the WSA.  The ALJ simply focused on the agreement as authority for

his conclusion that, in the condemnation proceeding, the City acquired only the right to divert water upstream from the dam. By the indenture, however, it is apparent that, in addition to the right to divert water, the City also acquired property, namely, the "real estate . . . described to the waters of the [c]reek and to the natural flow thereof" at parcel 33. The Rondout Riparian Section No. 2 map, filed pursuant to the WSA, clearly shows that parcel 33 was owned by Central Hudson and was improved by the dam.

We recognize that a riparian owner's right to the natural flow of water along its land is properly classified as real property, equally with the land (see Matter of Van Etten v City of New York, 226 NY at 486). As such, a party could acquire an interest in the water flow separate and distinct from the land under the water (see Matter of Niagara Mohawk Power Corp. v Cutler, 109 AD2d 403, 405 [1985], affd 67 NY2d 812 [1986]). The controlling point here, however, is that the "real estate" acquired in the condemnation, in conjunction with the indenture and agreement, is as defined under the WSA. The comprehensive statutory definition for "real estate" embraces both the water and the "lands under water." Because the ALJ considered only the "rights" that the City acquired by the condemnation and not the "property," the ALJ's conclusion that petitioners own the dam is not supported by substantial evidence in the record.

The February 1943 order of Supreme Court (Schirick, J.) in the condemnation proceeding does not compel a contrary result. By that order, the court cited the report of the commissioners appointed pursuant to the WSA "to ascertain and determine the compensation to be made to the owners of . . . the real estate laid down on a map entitled 'Rondout Riparian Sec. No. 2' . . . and described in the petition for the appointment of said commissioners of appraisal to the waters of the Rondout Creek and the natural flow thereof and any and all rights appurtenant thereto." The City contends that this order demonstrates that by the condemnation, the City took only Central Hudson's riparian rights. We cannot agree. The order does not include or resolve Central Hudson's claim as to parcel 33. Moreover, the record does not include the petition, and the order does not alter the nature of the real estate interest described in the Rondout

Riparian Section No. 2 map, as mirrored in the indenture.[3] Without the petition, we are thus left with the comprehensive definition of real estate in the WSA that includes "land under water," the Rondout Riparian Section No. 2 map that delineates the specific parcels and the indenture that describes the real estate acquired by the City with reference to the map. The dam is clearly depicted on the map and, in the context of a condemnation proceeding, "'[a]n appropriation of land, unless qualified when made, is an appropriation of all that is annexed to the land, whether classified as buildings or as fixtures'" (Matter of City of New York [Kaiser Woodcraft Corp.], 11 NY3d 353, 359 [2008], quoting Jackson v State of New York, 213 NY 34, 36 [1914]).

We note that, even if the City only acquired riparian rights at parcel 33, a riparian right to the natural flow of a stream is "natural and inherent" to those that own "land contiguous to a natural watercourse" (United Paper Bd. Co. v Iroquois Pulp & Paper Co., 226 NY 38, 44-45 [1919]). Only a riparian owner, or one who owns riparian rights, may construct and use a dam (see Warren's Weed, New York Real Property § 151.08 [3]). If the City acquired exclusive riparian rights, including "ponding rights," it follows that only the City has the right to "use" the dam.

Having found that the ALJ failed to properly assess the property acquired through the condemnation proceeding, we necessarily conclude that the subsequent conveyances are of no moment in resolving this dispute. Notably, while Central Hudson conveyed a number of parcels in the vicininty of the creek and dam by deed in 1949, that deed included a covenant against using the property for hydroelectric power generation and was expressly "subject to the rights acquired by the City of New York pursuant

---

[3] The omission of the petition is significant because, under the Laws of 1905 (ch 724, § 7), the petition must identify "the title interest or easement sought to be acquired to, in or over such parcel, whether a fee or otherwise." Any qualifications or limitations as to the nature of the taking had to be set forth in the petition.

to various condemnation proceedings heretofore taken."  On this record, it appears that because the City completed the condemnation acquisition in 1948, Central Hudson could not convey the same property — whether it was a riparian right to use the dam or the dam itself — to the Rondout Paper Company in the 1949 deed (see Real Property Law § 245; City of Kingston v Knaust, 287 AD2d 57, 60 [2001]).  Similarly, the subsequent 1976 conveyance into Recycled National Paper Corporation, petitioners' deed from an estate, and the Cooks' 1999 deed from Ulster County could not transfer any such rights in the dam.  Finally, we discern no basis in this record to conclude that any property owner has "possessed" the dam since the condemnation proceeding.  As such, we do not find substantial evidence to support the ALJ's determination that either petitioners or the Cooks owned the dam.

Having found that DEC's determination was not supported by substantial evidence, the Cooks' cross claims are dismissed as academic, and it is not necessary for us to consider the arguments raised with respect to the cross claims (see Matter of Arcuri v Kirkland, 113 AD3d 912, 916 [2014]).

McCarthy, Garry and Devine, JJ., concur; Stein, J.P., not taking part.

ADJUDGED that the determination is annulled, without costs, and petition granted.

ENTER:

Robert D. Mayberger
Clerk of the Court